Henry C. Carroll *v.* The City of Philadelphia, Charles F. Warwick, Mayor of said City, Thomas M. Thompson, Director of Public Works, The Vulcanite Paving Company, and The Pennsylvania Asphalt Company, a Corporation, Appellants, and the Alcatraz Paving Company.

*Equity—Preliminary injunction—Municipal contracts.*
On a bill in equity to restrain the officers of a city from awarding a contract for "lake asphalt," where it is alleged in the bill that the word "lake" was surreptitiously and fraudulently inserted in the ordinance authorizing the contract, and it is also alleged that there is no such thing as "lake asphalt" known to commerce, but the court finds the facts contrary to the allegations of the bill, a preliminary injunction should not be granted because the specifications required that the lake asphalt should be that obtained from two designated sources, "or other lake asphalt which in quality and durability shall be equal to the standard" of the asphalt from the places designated.

Argued July 15, 1897. Appeals, Nos. 241 and 243, Jan. T., 1897, by all the defendants, excepting the Alcatraz Paving Company, from order of C. P. No. 2, Phila. Co., March T., 1897, No. 884, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity to restrain the officers of the city of Philadelphia from awarding a municipal contract.

The facts appear by the opinion of PENNYPACKER, J., which was as follows :

By ordinance of the councils of the city of Philadelphia, approved April 12, 1897, the director of the department of public works was "authorized to enter into contracts with competent pavers for paving the following streets with sheet lake asphaltum on broken stone base and binder (naming thirty-three streets of the city)—provided, said streets shall be first dedicated or properly opened, and the department of public works first advertise for proposals for paving said streets, and award the contracts to the lowest bidders, and that the owners of prop-

erty fronting on said streets shall not be charged more than the contract price." The director advertised for proposals in which he said inter alia : " The ordinance of councils authorizing the paving of the above named streets directs that they be paved with sheet lake asphaltum. Only bids for such materials can be considered." He also prepared specifications which provide : " The said specifications for the work must have the formula of the wearing surface and the proportion of each of its ingredients, the thickness it will be laid loose on the street, and the thickness to which it will be compressed for the finished pavement. The wearing surface will be of Lake Trinidad or Bermudez lake asphalt or other lake asphalt which in quality or durability shall be equal to the standard of the Lake Trinidad or Bermudez. . . .

" 4. The proposal must give a description of the properties of the asphalt for the purposes of street paving, designating the locality and lake it is from, where asphalt of the same quality as sample has been used for street paving, and the length of time that pavement laid with material of the same quality as sample have been down, and the proportions of the several ingredients in the wearing surface of each street pavement that may be given as a reference. . . .

" 8. Refined lake asphalt for the wearing surface shall be composed of (1) The best quality of refined Trinidad or Bermudez lake asphalt obtained from the so-called pitch or asphalt lake on the island of Trinidad or from Bermudez, South America, or other lake asphalt which in quality and durability shall be equal to the standard of the Lake Trinidad or Bermudez ——"

On April 22, 1897, the director of public works awarded to the Vulcanite Paving Company, one of the defendants, the paving of sixteen of the streets, to the Pennsylvania Asphalt Paving Company the paving of sixteen other of the streets, and to Richardson & Ross the paving of the remaining street. The contracts have not yet been signed. Thereupon the complainant filed a bill in equity setting forth that he is a citizen, resident and taxpayer of the city and the owner of a large amount of real estate within it; that the bids of the Vulcanite Paving Company were at the rate of from $1.95 to $2.14 per square yard, the bids of the Pennsylvania Asphalt Paving Company were at the rate of from $1.90 to $2.12 per square yard, that

there was a bid by the Alcatraz Paving Company at the rate of $1.65 per square yard, which was the lowest bid, and which, had it been accepted, would have saved to the city many thousands of dollars; and asking for an injunction to restrain the city from executing the contracts, and a decree declaring the awards void.

It is contended upon the part of the complainant in the first place that the word " lake " was inserted in the ordinance as passed by councils surreptitiously and fraudulently. It appears from the testimony that the ordinary method of handling bills for paving in councils is that when the bill is offered it is referred to the committee upon highways, and by that committee to the sub-committee on the particular district. The sub-committees send their reports to the general committee, and from these reports an ordinance is drafted usually by the clerk of that committee. The ordinance is printed, each member of councils has a copy furnished to him, and the ordinance is read aloud before its adoption. In the present instance some of the bills had the word " lake " in them when first offered, but in the rest, with the exception of five, that word was inserted while the bills were before the sub-committee of the committee on highways, either by the chairman of the sub-committee or by the clerk of the general committee. This word appeared in the ordinance as reported to councils, and the ordinance was printed, supplied to the members, and read according to the usual custom. No chairman of a sub-committee has testified that it was inserted without his direction. No member of council has testified that when the bill was passed it was not known for what they were voting. In the absence of clear and convincing evidence it is not to be presumed that they were misled into the adoption of a measure which was not intended. We think the allegation of fraud has not been supported by the testimony.

It is urged in the second place on the part of the complainant that there is no distinction in fact between lake asphalt and other asphalt and that there is no such thing known to commerce as lake asphalt. The deposit of asphalt in the island of Trinidad is situated about a mile from the shore of the gulf, at an elevation of one hundred and thirty-eight feet, and occupies apparently the crater of an extinct volcano. In the center the

asphalt bubbles up in large masses which some of the witnesses have described as having the appearance of huge mushrooms. Is has a movement which, though imperceptible to the eye, can be ascertained by comparing an object inserted in it with others which are fixed upon the shore. This deposit has been known for a long while. Thomas Jeffreys, in his "Description of the Spanish Islands and Settlements on the Coast of the West Indies," printed in London, 1762, says of Trinidad: "The chief things it abounds with is a kind of fossil pitch or bitumen which the Spaniards call Tierra de Brea; it is found in the eastern corner of this island, where there is such a quantity of it that they may carry it away by shiploads, but the Spaniards pretend that it cannot be of any use on account of its melting too easily by the heat of the sun." This English account is, however, only an imperfect translation from the Dutch of Joannes de Laet, who as early as 1630 published in Leyden a "Berschijvinghe van West Indien," wherein he says of Trinidad: "Indit Eylandt is oock een punct welck de ingheboorne noemen Piche, ende Spaegniarden Tierra de Brea, waer sulcken abundantie legt van steen-peck dat men daer ontallijke schepen mede soude konnen laden dan en is niet seer goet on de schepen mede te pecken door dien het van de Sonne soo weeck werdt dat men daer in treedt als kley." Apparently it was first called a lake in the transactions of the Royal Society of London by Alexander Anderson in 1789, and since that time it has been very generally so designated in the different publications upon the subject. Between the lake and the shore of the gulf are what have become known as the land deposits, which are more or less covered with soil, and show the effect of exposure to the elements.

The deposit of asphalt at Bermudez, in Venezuela, is much more extensive than that at Trinidad, and covers an area of about eleven hundred acres in a depression or valley near the river Monoco. In the center appear to be three sources from which the asphalt in a soft condition is poured upward, and when any of it is removed the mass soon regains its level. Toward the edges it is hard, and upon three sides of the deposit there are hills. It is called in the vicinity the pitch lake. Its discovery appears to have been comparatively recent, as it was described as a new pitch lake in 1889. Evidence was produced

to show also the existence of an asphalt lake in Mexico, from four hundred to six hundred feet in length and from one hundred and fifty to two hundred feet in width, and that the company which owned it had entered into contracts for paving with municipalities in Chicago and elsewhere. There are also smaller similar lakes on the island of Trinidad and at Pedernales in the delta of the Orinoco.

A distinction originated in the island of Trinidad between the pitch taken from the lakes and the overflow pitch, or that taken from the land, and it would appear from the greater part of the testimony presented that this distinction has resulted in a commercial designation. Some of the witnesses testified that this distinction was based upon the fact that the pitch taken from the lake was more alive, had more of the characteristics of a cement, than that exposed in a greater degree to the action of the elements, and that the processes of nature had more thoroughly blended the silica with the bitumen than was the case with asphalts known as land asphalts where this process of blending had to be done artificially. That these causes would produce differences of conditions seems to be highly probable, and if practical experience shows that they actually exist, the fact that chemical analysis may indicate the same components in different asphalts is not very material. While it is quite clear that the Bermudez asphalt has not for so long a time nor so generally been described as lake asphalt, and some of the experts did not know it as lake asphalt, and while the contract between the owners, the New York and Bermudez Company, and the defendant, the Pennsylvania Asphalt Paving Company, calls it "Bermudez asphalt," nevertheless, there is considerable testimony to show that it was advertised and known as a lake asphalt. Thomas M. Thompson testified that it was "recognized as a lake sheet asphalt in the commercial world." Samuel P. Sadtler, called for the complainant, testified: "I have gathered that there does exist a commercial distinction between Trinidad lake asphalt and Trinidad land asphalt." Of the Bermudez, he says: "It is simply spread over the surface, and it is spoken of by parties who sell it as a 'lake' or 'deposit.'" In a printed report made in May, 1894, he called it "Bermudez Lake asphalt." Stevenson Towle, called for the complainant, testified: "It is probably as much of a lake as the Trinidad. I do not consider either of them as

lakes, excepting they are called lakes." George W. Tillian for the complainant testified : " It is described commonly as a lake or deposit," though he also said that the asphalt from Trinidad was generally designated as lake or land asphalt and that the Bermudez was not known commercially as a lake asphalt. George W. Elkins testified : " I know of Bermudez lake asphaltum from using it, and I also know, as everybody else knows, that there is a Trinidad lake asphaltum. . . . I have heard of Mexican lake being in the market in Chicago." He further said that if lake asphaltum was demanded the person requiring it would have to take Trinidad, Bermudez or Mexican. L. S. Filbert testified that he first heard of Bermudez lake asphalt ten or fifteen years ago, and that " I have never yet seen a land asphalt outside of a rock asphalt that would compare with lake asphalt.—I have seen small specimens of lake asphalt, and it was said it was lake asphalt from Mexico." He further testified that he had known the distinction between lake and land asphalts for twenty years, and that the latter was at least one third cheaper, and that a pavement laid with the lake asphalt would last twice as long as one laid with land asphalt. The United States consular report for 1892 says of Bermudez : " This immense and inexhaustible deposit of asphalt is more popularly known as an asphalt lake since it is constantly but almost imperceptibly in motion." Philip W. Henry testified : " There was a bidding for about 80,000 square yards in Hoboken about a month ago in which there were five or six different bidders, and there was a bid put in by Henry & Magoffin, a local firm of contractors, in which they were going to use Mexican lake asphalt." Clifford Richardson testified : " The application to distinguish Trinidad pitch as lake and land pitch was immediately applied in the following year (1890) to Bermudez asphalt."

From this testimony it is found as a fact that there is an article at the present time sufficiently well known commercially as lake asphalt and distinguished from other asphalts not secured from lake deposits. There being such an article, it was entirely within the power of the councils, if in their judgment this material best answered the needs of the municipality for the purpose of paving, to require by ordinance that it should be furnished.

The final question is whether, there being a commodity known

commercially as lake asphaltum and the councils having by ordinance provided that the paving should be done with "sheet lake asphalt," it was within the power of the director of public works to qualify that direction in such a way as to demand that the asphalt should come from any particular lake, or to be equal to that of a particular lake. In his specifications he requires: " Refined lake asphalt for the wearing surface shall be composed of (1) the best quality of refined Trinidad or Bermudez lake asphalt, obtained from the so-called pitch or asphalt lake on the island of Trinidad or from Bermudez, South America, or other lake asphalt which in quality and durability shall be equal to the standard of the lake Trinidad or Bermudez." This raises an important question, and the industry of counsel has not succeeded in finding a case in which it has been determined. When we are dealing, not with an article of manufacture, but a natural production, it is evident that, since nature rarely or never duplicates her work, if the director may direct that the supply shall come from a particular source, or be equal to the material from that source, it is within his power to say that the municipality shall purchase from a particular person or corporation. In the recent case of Filbert v. City, 181 Pa. 530, Chief Justice STERRETT and Justice WILLIAMS, in their concurring opinion, say: "Changes made in the contracts of the city should be made only by the city. The municipality ought never to attempt, nor, if the question be properly raised, has it the legal right to abdicate its functions and invest an officer with unlimited power over its contracts, and the pockets of its taxpayers." It is clear that it was the expectation of the director that the wording adopted in the specifications would have the effect of confining the contracts to those having control of the Trinidad and Bermudez deposits, because he testifies: "I awarded the contract to them because the ordinance said that it should be lake asphalt, and to the best of my knowledge and belief, and all the investigations made, information that I have, they were the only parties who could furnish the lake asphalt." It is equally clear that this was the result produced, because when the contracts were awarded they were all given to one or the other of these companies, with the exception of one street. Without determining the question as to whether the director may in his specifications depart from the

language of the ordinance, where that language sufficiently describes a known article of commerce, we are within the line of safety in holding that if he does set up a further test of quality, that test should be expressed with such precision that it will be comprehended by the ordinary bidder, and not have the effect of deterring such bidder from entering into competition for the article needed. A specification which has the effect of putting unnecessary obstacles in the way of those who may want to bid is faulty and illegal. There ought to be a clear description of the commodity which is required, and then every opportunity ought to be given to those who may have the commodity to enter into competition for the contract. As was said by the present Chief Justice in Mazet v. Pittsburg, 137 Pa. 561: "It cannot be doubted that the true intent of the act of 1874, and the ordinances passed in pursuance thereof, regulating the awarding of public contracts, is to secure to the city the benefit and advantage of fair and just competition between bidders and at the same time close as far as possible every avenue to favoritism and fraud in its varied form." If the director had required in his specifications that the asphalt to be used should be equal in quality and durability to a sample of asphalt exhibited to persons wishing to bid, or to the asphalt used in the paving of a certain street in the city already laid, there would have been a standard of comparison easily understood and of ready access to all who might be interested. What he has demanded is that the asphalt shall come from two designated lakes "or other lake asphalt which in quality and durability shall be equal to the standard of the lake Trinidad or Bermudez." What is the standard of the lake Trinidad or Bermudez? There is no such standard. According to the testimony of Mr. Clifford Richardson, the expert called by the defendants, the crude Trinidad asphalt contains 25.31 per cent of bitumen, and the crude Bermudez from 70 to 90 per cent of the same substance. He further testified: "Q. So that they differ in respect to this, that the Bermudez is a composition which has not any, practically, of that 39 per cent of useful matter which is found in the Trinidad? A. Yes, sir."

He is here referring to the silica, the minute intermingling of which by the forces of nature with the bitumen constituted one of the reasons why, in his opinion and that of another witness,

lake asphalt was superior to land asphalt. The director has therefore set up a standard with a double head, a sort of contractual monstrosity. If the standard of Trinidad asphalt were fixed, and if the standard of Bermudez asphalt were fixed, and if the specifications had requested bids for material equal to the Trinidad standard and also other bids for material equal to the Bermudez standard, that would call for a system of alternative bidding which, under some circumstances, might have advantages. This course, however, was not pursued, and it is by no means certain that there is a fixed standard quality for the asphalt of either of those two lakes. There was evidence that there were two grades of Trinidad lake asphalt and positive and strong evidence that the asphalt from the Bermudez lake was quite variable. Illustration is sometimes an aid to thought. If the ordinance had called for a supply of timothy hay, which is a product of nature, and if the director had required in his specification that the hay should come from the farm of A and the farm of B, or be equal to the standard of hay grown on these farms, if it were the fact that the hay from these farms differed from each other and depended to some extent upon the season, and if the farms were in another land, we should have a case nearly parallel to the present.

It may well be admitted that the director had no intent, by the unfortunate use of the language of the specifications, to create confusion. Doubtless he believed himself to be acting for the best interests of the city and to be carrying out the instructions received by him from councils. Nevertheless the owners of the Trinidad asphalt, or those who controlled it, knew precisely what they were bidding for, since it was material coming from their own lake, and for the same reason the owners of the Bermudez asphalt had precise information, but their possible competitors were left in entire uncertainty. How can we know that had it been otherwise there would not have been bids from the owners of the Mexican lake, and of the Perdenales lake, and of the smaller lake in Trinidad, and of perhaps other asphalt lakes unfamiliar to us, and the city in that way have been much benefited?

The complainant being a resident, a taxpayer, and a real estate owner, is entitled to bring the suit whatever may be alleged to be his ulterior purposes: Mazet v. Pittsburgh, supra.

For these reasons the injunction will be issued and a decree made in accord with the prayer of the bill.

*Error assigned* was decree of the court.

*James Alcorn*, assistant city solicitor, with him *John L. Kinsey*, city solicitor, for appellant.—Unless it be shown that the authorities have acted corruptly, and in bad faith, the court will not interfere to restrain them in the awarding of contracts to the lowest responsible bidder : Com. v. Mitchell, 82 Pa. 343 ; Findley v. Pittsburgh, 82 Pa. 351 ; Douglass v. Com., 108 Pa. 559 ; Paving Co. v. Wagner, 139 Pa. 623 ; Paving Co. v. Phila., 164 Pa. 477 ; Reuting v. Titusville, 175 Pa. 512.

A municipality as well as an individual has a right to select what, in the judgment of the authorities, is the best article, whether it be patented or owned by an individual or a corporation absolutely : Silsby v. Allentown, 153 Pa. 319 ; Mulrein v. Kalloch, 61 Cal. 522 ; Detroit v. Hosmer, 44 Northwestern Rep. 622.

*E. O. Michener*, for Pennsylvania Asphalt Paving Co., appellant, and *M. Hampton Todd*, for the Vulcanite Paving Company, appellant, cited Mazet v. Pittsburgh, 137 Pa. 548 ; Com. v. Mitchell, 82 Pa. 343 ; American Pavement Co. v. Wagner, 139 Pa. 623 ; Interstate Vitrified Brick & Paving Co. v. Philadelphia, 164 Pa. 477.

*John G. Johnson*, with him *Dimner Beeber, Hampton L. Carson, J. Levering Jones, M. W. Van Auken* and *E. Cooper Shapley*, for appellee, cited Nicolson Pavement Co. v. Painter, 35 Cal. 699 ; Boon v. City of Utica, 5 Misc. Rep. 391 (1893) ; People v. North River Sugar Refining Co., 22 Abbott's New Cases, 164 ; Greenhood on Public Policy, 178 ; Spelling on Trusts, sec. 72.

PER CURIAM, October 11, 1897 :

October 11, 1897, it is ordered, adjudged and decreed, that the decree of the court below awarding the preliminary injunction from which this appeal is taken be and the same is hereby reversed and set aside ; record remitted for further proceedings.